AMANDA MANCINI,　　　　　　　　　：
　　　　　Plaintiff,　　　　　　　　：　　　CASE NO. 3:17-CV-01625-MPS
　　　　　　　　　　　　　　　　　　：
　　　v.　　　　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　：
ACCREDO HEALTH GROUP, INC.,　　：
　　　　　Defendants.　　　　　　　：　　　September 4, 2019

_____

## RULING ON MOTION FOR SUMMARY JUDGMENT

### I.  Introduction

The Plaintiff, Amanda Mancini, filed this action challenging a decision by

Accredo Health Group to terminate her employment as an infusion nurse.  In her

complaint, Mancini alleges retaliation in violation of the Family and Medical Leave Act,

disability discrimination in violation of the Americans with Disabilities Act, and

disability discrimination in violation of the Connecticut Fair Employment Practices Act.

(ECF No. 1.)  Accredo has moved for summary judgment on all counts.  (ECF No. 24.)

For the reasons set forth below, the motion for summary judgment is GRANTED as to

the ADA claim and the CFEPA claim, and DENIED as to the FMLA claim.

### II.  Factual Background

The following facts, which are taken from the parties' Local Rule 56(a)

Statements and the exhibits, are undisputed unless otherwise indicated.

### A. Mancini's Position with Accredo

Plaintiff Amanda Mancini began working for Defendant Accredo Health Group

on or about November 24, 2014 as an Infusion Nurse.  (ECF No. 25-1[1] ("Def.'s L.R.

_____

[1] A redacted version of the Defendant's Local Rule 56(a)(1) statement has been posted to the docket as
ECF No. 24-2.

56(a)(1) Stmt.") at ¶ 9; ECF No. 27-11 ("Pl.'s L.R. 56(a)(2) Stmt.") at ¶ 9.)  Mancini's

primary function as an Infusion Nurse was to provide in-home intravenous ("IV")

infusion medical treatment and to assist patients with administering their medications.

(Def.'s L.R. 56(a)(1) Stmt. at ¶ 12; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 12.)

Generally, during a home visit, Mancini would first ensure that a patient's IV line

was correctly in place and connected to a hep-lock.  (Def.'s L.R. 56(a)(1) Stmt. at ¶ 14;

Pl.'s L.R. 56(a)(2) Stmt. at ¶ 14.)  A "hep-lock," also known as a "saline lock," is an

"intravenous portal, usually placed and left in a vein in one of the patient's arms, and

used episodically for fluid or medication infusions." *Saline Lock*, Medical Dictionary,

http://medical-dictionary.thefreedictionary.com/saline+lock (last visited Aug. 29, 2019).

If a patient already had a hep-lock in place, Mancini would ensure that the patient's hep-

lock was adequately functioning by flushing it with saline solution.  (Def.'s L.R. 56(a)(1)

Stmt. at ¶ 14; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 14.)  If a patient did not already have a hep-

lock in place, Mancini would be responsible for inserting one.  (Def.'s L.R. 56(a)(1) Stmt.

at ¶ 15; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 15.)  In order to insert a hep-lock, Mancini would

attempt to locate a vein, insert a peripheral intravenous catheter with a needle, and then

remove the needle so as to leave only the catheter in the patient's vein.  (Def.'s L.R.

56(a)(1) Stmt. at ¶ 16; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 16.)  If unable to properly insert the

hep-lock into a vein, Mancini would attempt to do so again by fully removing the needle

from the vein and inserting it in a different location.  (Def.'s L.R. 56(a)(1) Stmt. at ¶ 17-

18; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 17-18.)  Under Accredo's policy, Mancini was allowed

to make three attempts at inserting the hep-lock before having to call a separate infusion

nurse for additional assistance.  (Def.'s L.R. 56(a)(1) Stmt. at ¶ 19; Pl.'s L.R. 56(a)(2)

Stmt. at ¶ 19.)   Once an IV line was secured and a patient's vitals were reading normally, Mancini would then open and mix the patient's medication.  (Def.'s L.R. 56(a)(1) Stmt. at ¶ 20; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 20.)  After administering the patient's medication, Mancini was responsible for disposing of all garbage, including gauze, alcohol swabs, and wrappers, into the patient's waste can, and disposing of all needles into a "sharps" container.  (Def.'s L.R. 56(a)(1) Stmt. at ¶ 21; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 21.)

**B.  Mancini's Request for FMLA Leave**

On March 22, 2016, Mancini requested intermittent leave under the FMLA through AON Hewitt, a third-party vendor that handled FMLA leave requests for Accredo.  (Def.'s L.R. 56(a)(1) Stmt. at ¶ 30-31; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 30-31.)  Mancini suffers from adrenal insufficiency, leukocytosis, and thrombocytosis, for which she has been hospitalized several times.  (ECF No. 27-2 ("Pl.'s Aff.") at ¶ 82.)  AON approved Mancini for intermittent leave for a maximum of ten times per month, with each absence allowed up to a full day.  (Def.'s L.R. 56(a)(1) Stmt. at ¶ 32; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 32.)  On the same day, Mancini requested and AON approved FMLA leave for April 8, 2016.   (ECF No. 24-3 at 13; Pl.'s Aff. at ¶ 42.)

According to Accredo, Mancini was pre-approved for intermittent leave, and the only further requirement was that she report her FMLA absences to AON Hewitt no later than 11:59 pm on the day of the absence.  (Def.'s L.R. 56(a)(1) Stmt. at ¶ 33; ECF No. 24-1 at 3, 18.)  According to Mancini, however, on the evening of March 22, 2016—the same day she was approved for intermittent leave—Mancini received a phone call from her supervisor, Lois Klansek, who confronted her about scheduling a day of intermittent leave for April 8, 2016 for a doctor's appointment.  (Pl.'s Aff. at ¶¶ 48-49.)  Klansek told

Mancini that before she scheduled any days off, she had to first report to Klansek and obtain her clearance, because another nurse had been given April 8 off, and Klansek had "no nurses to cover Southeastern Connecticut." (*Id.* at ¶¶ 48-49.) Mancini also claims Klansek told her that going to AON for FMLA approval without going to her first was not "being a team player" because once AON approved a request for leave, Klansek could not deny it. (*Id.* at ¶ 49.)

## C. Mancini's April 6 Appointments

On April 6, 2016, Mancini was scheduled to visit three patients. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 36; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 36.) When Mancini arrived at the first patient's home, she was feeling "feverish, flushed, and weak, and was profusely sweating." (Def.'s L.R. 56(a)(1) Stmt. at ¶ 40; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 40.) The patient already had a hep-lock inserted, but when Mancini flushed it with saline solution to ensure it was adequately working, she "received resistance from the saline solution on three separate flushes," so she determined she had to reinsert the hep-lock in another location. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 43; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 43.) She "spent about an hour and a half flushing the saline solution despite it normally taking fifteen minutes." (Def.'s L.R. 56(a)(1) Stmt. at ¶ 44; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 44.)

Mancini made at least three attempts at "sticking the patient's vein," but was unsuccessful. (Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 46, 48; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 46, 48.) The patient's family reported that Mancini made at least five attempts (Def.'s L.R. 56(a)(1) Stmt. at ¶ 49), but Mancini claims to have only made three attempts (Pl.'s Aff. at ¶ 50). In either case, Mancini eventually telephoned another nurse, Karen Chasse, to request assistance. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 53; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 53.)

According to Chasse, when she arrived, "the house was in disarray with IV supplies scattered across several surfaces," and the family of the patient told her "that Mancini had previously fallen into the refrigerator." (ECF No. 24-5 at ¶ 8.) Accredo also claims that the patient's family told Chasse that Mancini "looked scary" with "Parkinson like movements" and that Mancini "left a bloody gauze on the couch" as well as used needles on the floor and coffee table. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 59.) Mancini denies these allegations and claims she kept the supplies organized, although she admits that there "might have been one piece of gauze on the floor." (Pl.'s Aff. at ¶ 53.) After Chasse arrived, Mancini went into the bathroom, while Chasse started the patient's IV without difficulty. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 60-61; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 60-61.)

At this point, Chasse phoned Mancini's supervisor, Klansek, to express concern for Mancini's well-being and current state. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 62; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 62.) Klansek, in turn, phoned Mancini to express concern and ask how she was feeling. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 63; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 63.) What more was said during that conversation is hotly disputed by the parties. Mancini claims that she made a medical leave request and that Klansek denied it because she had no one else to cover the patients. (Pl.'s L.R. 56(a)(2) Stmt. at ¶ 118; Pl.'s Aff. at ¶ 46.) According to Mancini, one of her April 6 patients was "the patient of a certain doctor who provided a lot of business to [Accredo], and it was known that it was very important to keep patients for that particular doctor happy." (Pl.'s L.R. 56(a)(2) Stmt. at ¶ 120.) Accredo claims no FMLA request was made. (ECF No. 30 at 3-4.)

Mancini then drove to her next patient—her third scheduled appointment. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 68; ECF No. 24-3 at 47.) Her second scheduled appointment had cancelled because Mancini was by now running too late for the patient's schedule. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 69; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 69.) Mancini's appointment with this patient—her second of the day—did not go well. The patient asked Mancini to leave "within minutes of [her] entering" the patient's home because she thought Mancini was "under the influence." (Def.'s L.R. 56(a)(1) Stmt. at ¶ 76; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 76.) The patient later reported that Mancini "'[l]ooked like she was on crack,' was disheveled with slurred speech and fell into a wall." (Def.'s L.R. 56(a)(1) Stmt. at ¶ 75; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 75.) Mancini claims she was not disheveled, did not slur her speech, and did not fall into a wall. (Pl.'s Aff. at ¶ 54.) But she does not dispute the fact that the patient reported these things.

Mancini offered to "urinate in a cup" to prove she was not intoxicated, apparently at the suggestion of the patient, who had formerly worked at a half-way house. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 77; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 77; ECF No. 24-3 at 52.) She spent some time in the bathroom to this end, but had difficulty urinating and failed to provide a sample. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 79; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 79.) After Mancini came out of the bathroom, the patient and her husband offered to drive Mancini thirty-five to forty minutes to Mancini's home. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 81; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 81.) They were concerned that Mancini was not in a condition to drive herself. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 82; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 82.) Despite the offer, Mancini decided to drive herself home. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 82; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 82.)

**D. Mancini's Arrest and Hospitalization**

The patient and her husband were so concerned about Mancini's ability to drive that they decided to call 911, and, shortly thereafter, Mancini was pulled over. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 84-85; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 84; Pl.'s Aff. at ¶ 86.) According to the police report, Mancini "appeared 'visibly upset, crying and speaking nonsensically,'" "'displayed 'incoherent speech,'" and failed a field sobriety test. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 86, 91; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 86, 91; ECF No. 25-2 at 4-5.) Mancini argues that she "did well on the field sobriety test" and "did not almost fall over," but does not contest that the police officers concluded that she failed, nor does she contest Accredo's characterization of the police report. (Pl.'s Aff. at ¶ 87; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 91.) Mancini was placed under arrest for driving under the influence, failing to drive right, and failing to maintain a reasonable distance and was taken to the police station. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 91; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 91.)

At the police station, according to Accredo, Mancini refused to provide a urine sample, and the female police officer who accompanied her to the bathroom reported that Mancini was "playing games." (Def.'s L.R. 56(a)(1) Stmt. at ¶ 93-95.) According to Mancini, her inability to urinate was the result of her condition, specifically her "severe dehydration[] and acute renal insufficiency" (Pl.'s Aff. at ¶ 60), and she passed a "standard breathalyzer test," which indicated she had "0% alcohol" in her system (Pl.'s Aff. at ¶ 61).

Mancini was transported in an ambulance to Backus Hospital in Norwich CT in order to be evaluated. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 96; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 96.) The doctor who examined Mancini at the hospital indicated that she "appear[ed]

intoxicated" and "altered."  (Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 98-100; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 98-100.)  At the hospital, Accredo claims Mancini tested positive for amphetamines.  (Def.'s L.R. 56(a)(1) Stmt. at ¶ 102.)

According to Mancini, she was given blood and urine tests at the hospital, which indicated that she did not have any alcohol in her system.  (Pl.'s Aff. at ¶¶ 64-65.) Mancini admits that "[t]he urine test indicated there were amphetamines in [her] system," but claims that "the only amphetamine in [her] system was Evekeo," also known as "amphetamine sulfite," which is used to treat "ADD/ADH[D]," and for which Mancini had a prescription.  (Pl.'s Aff. at ¶¶ 66-70.)  Mancini was diagnosed at the hospital with "altered mental status, renal insufficien[c]y, leukocytosis, and tobacco abuse" and "treated . . . with IV fluids." (Pl.'s Aff. at ¶¶ 73-74.)  Mancini has introduced evidence, in the form of an affidavit by one of her treating medical providers, that her apparent intoxication on April 6 was the result of complications from dehydration and anemia. (Pl.'s Aff. at ¶ 71; Pl.'s Aff. at ¶ 71.)  Mancini was released from the hospital the next day, April 7, 2016.  (Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 101, 105; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 101, 105; Pl.'s Aff. at ¶¶ 76, 78.)

**E.  Mancini's Suspension and Termination**

Mancini was scheduled to work on April 7, 2016, but she did not show up to work, nor did she telephone her supervisor.  (Def.'s L.R. 56(a)(1) Stmt. at ¶ 106; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 106.)  According to Mancini, she was unable to call Accredo while in Backus Hospital due to her condition.  (Pl.'s Aff. at ¶¶ 57, 77.)  She called "as soon as practical, and within 24 hours of the time [she] left the hospital."  (Pl.'s Aff. at ¶ 57.)

The next day, April 8, Mancini called Klansek, who conferenced in Collette Petrecco, a representative from Accredo's Human Resources Department. (Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 107-08; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 107-08.) Klansek and Petrecco listened to Mancini's version of what happened on April 6 and requested that Mancini submit a written timeline of the events. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 109; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 109.) Klansek and Petrecco also informed Mancini that she was being placed on suspension and that they would conduct an internal investigation. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 110; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 110.) According to Mancini, she also made a medical leave request on April 8, for her hospitalization from April 6 through April 7. (Pl.'s Aff. ¶ at 47.) But according to Accredo, the "only FMLA absence Mancini ever requested was for April 8, 2016, when she had an existing appointment for a bone marrow biopsy." (Def.'s L.R. 56(a)(1) Stmt. at ¶ 39.)

On April 19, 2016, Mancini received a phone call from Petrecco and Klansek's supervisor, Rich Soulsby. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 111; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 111.) They informed her that she was being terminated "for violation of Accredo Health's policy, including unprofessional behavior based on complaints received from patients." (Def.'s L.R. 56(a)(1) Stmt. at ¶ 112; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 112.)

## III. Legal Standard

Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (internal quotation marks and citations omitted). "A fact is

material when it might affect the outcome of the suit under governing law," and a dispute of fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal citations and quotation marks omitted). The moving party bears the burden "of showing that no genuine factual dispute exists . . . , and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences" in favor of the nonmoving party. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995).

## IV. Discussion

## A. The ADA Claim

Mancini argues that Accredo violated the ADA, 42 U.S.C. § 12112, by firing her due to her physical disability. (ECF No. 1 at ¶ 47.) The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Claims of disability discrimination are evaluated under the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 486 Fed. App'x 739, 741 (2d Cir. 2014). Under that framework, the plaintiff "must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate nondiscriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of

persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

**1. Mancini's Prima Facie Case**

To establish a prima facie case of discrimination under the ADA, a plaintiff must show that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Sista*, 445 F.3d at 169. It is undisputed that Accredo was subject to the ADA at all relevant times. Accredo further concedes, for the purposes of this motion, that Mancini "is 'disabled' with the meaning of the ADA," is "minimally qualified for her position," and "suffered an adverse employment action." (ECF No. 24-1 at 16 n.1.) The sole element of Mancini's prima facie case that remains in dispute, then, is whether her termination was "because of [her] disability." To establish this element, Mancini must point to evidence showing that discrimination was the "but-for" cause of her termination. *See Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019) (holding that the "but-for" causation standard, and not the "motivating factor" standard, applies to ADA discrimination claims). Still, "the burden of making out a prima facie case is not onerous . . . ." *Ben-Levy v. Bloomberg, L.P.*, 518 Fed. App'x 17, 19 (2d Cir. 2013) (internal quotation omitted).

To support her claim that she was terminated because of her disability, Mancini relies on the temporal proximity between her medical emergency on April 6, 2016 and her termination on April 19, 2016. (ECF No. 27-1 at 12.) Mancini also argues that Klansek's resistance to her taking FMLA leave, in the form of telling Mancini that she

was not a "team player" when she took FMLA leave "before going to [Klansek]" first (Pl.'s Aff. at ¶ 19), is further evidence of "discriminatory animus." (ECF No. 27-1 at 10.) Mancini also argues that Klansek's denial of Mancini's reasonable request for family leave on April 6, 2016 when Klansek and Mancini spoke over the phone between Mancini's first and second appointments, is further evidence of "discriminatory animus." (*Id.*) It is unclear that this evidence constitutes evidence of intent to discriminate *on the basis of disability*, as opposed to evidence of intent to retaliate for requesting or taking leave. Nonetheless, I will assume for purposes of this analysis that Mancini's termination less than two weeks after her medical emergency on April 6 is sufficient to establish a prima facie case of disability discrimination under the ADA. *See, e.g.*, *Baron v. Advanced Asset and Property Management Solutions, LLC*, 15 F. Supp. 3d 274, 283 (E.D.N.Y. 2014) ("[C]ourts in this circuit have held that the temporal proximity of an employee's disclosure of a disability to his termination support an inference of discrimination."); *Trent v. Town of Brookhaven*, 966 F. Supp. 2d 196, 206 (E.D.N.Y. 2013) (holding that "temporal proximity may be sufficient to show a prima facie case") (citing cases).

## 2. Accredo's Legitimate, Non-Discriminatory Reason for Mancini's Discharge

The burden now shifts to Accredo to offer a legitimate, non-discriminatory reason for terminating Mancini's employment. Accredo has offered substantial evidence that it had non-discriminatory reasons for terminating Mancini. Accredo told Mancini at the time, and continues to maintain now, that "she was [terminated] for violation of Accredo Health's policy, including unprofessional behavior based on complaints received from patients." (Def.'s L.R. 56(a)(1) Stmt. at ¶ 112; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 112.)

Accredo cites patient complaints that Mancini appeared intoxicated during an appointment (Def.'s L.R. 56(a)(1) Stmt. at ¶ 75-76; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 75-76.), was falling into walls (*id.*), fell into a refrigerator (ECF No. 24-5 at ¶ 8.), left bloody gauze and used medical supplies lying around (*id.*; Def.'s L.R. 56(a)(1) Stmt. at ¶ 59), offered to provide a urine sample to prove she was not intoxicated, spent an extended period of time in the patient's bathroom attempting to urinate (Def.'s L.R. 56(a)(1) Stmt. at ¶ 77; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 77), and stuck a patient more than the three times allowed by Accredo's policy (Def.'s L.R. 56(a)(1) Stmt. at ¶ 49). This evidence supports Accredo's contention that Mancini was terminated for acting unprofessionally and failing to provide adequate nursing care to her patients—certainly a legitimate, non-discriminatory reason for termination.

### 3. Mancini's Evidence that Accredo's Proffered Reasons Are Pretextual

The burden thus shifts back to Mancini to "produce[] evidence that would tend to show that the proffered reason was merely a pretext for discrimination, which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." *Sista*, 445 F.3d at 173 (internal quotation omitted). Here, Mancini's disability discrimination claim founders. Mancini has failed to produce evidence creating a genuine dispute of material fact as to whether Accredo's proffered reasons for her termination are pretextual.

It is true that Mancini disputes many of the details of her conduct during her April 6 appointments. For example, she denies falling into a refrigerator or a wall (Pl.'s Aff. at ¶¶ 53-54), denies that she left used medical supplies lying around the first patient's home

(beyond a single piece of gauze) (*id.*), denies sticking the first patient more than three times (*id.* at ¶ 50), and denies that she was under the influence of illegal drugs or alcohol, as the patients believed she was (*id.* at ¶ 87). Mancini argues that these and other disputes represent genuine disputes of material facts, precluding summary judgment. (ECF No. 27-1 at 5.)

But "the factual validity of the underlying imputation against the employee is not at issue"; rather, the relevant question is "what '*motivated* the employer.'" *McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) (quoting *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). "We are decidedly not interested in the truth of the allegations against plaintiff." *Id.* Mancini does little to show that Accredo's proffered reasons were pretextual. She does not dispute the fact that the patients made the complaints Accredo claims they did. She admits, for example, that her second patient thought she was intoxicated, and consequently asked Mancini to leave shortly after she arrived at the patient's home. (Def.'s L.R. 56(a)(1) Stmt. at ¶ 76; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 76.) Even assuming, as the Court must at this stage, that Mancini's version of the day's events—and not the patients'—is the correct one, this does nothing, by itself, to show that Accredo's reliance on the patients' complaints (as well as the reports of the police officers who arrested Mancini and the nurse who assisted her) was pretext for discriminatory animus. *See Toussaint v. NY Dialysis Services, Inc.*, 706 Fed. App'x 44, 45 (2d Cir. 2017) (affirming summary judgment for employer because even if a reasonable jury could conclude that the employer erroneously credited a colleague's version of events rather than the plaintiff's, it did not follow that the employer's proffered reasons were pretextual).

Mancini has also produced evidence, in the form of an affidavit and a letter from two of her treating healthcare providers, that her behavior on April 6 was the result of her disability. (ECF No. 27-5; ECF No. 27-3.) But "workplace misconduct is a legitimate and nondiscriminatory reason for terminating employment, even when such misconduct is related to a disability." *McElwee v. Cty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012); *see also Sista*, 445 F.3d at 172 (ADA does not "require that employers countenance dangerous misconduct, even if that misconduct is the result of a disability."). Whether Mancini's alleged misconduct was the result of her disability is not at issue in this case.

Mancini also argues that the temporal proximity between her termination and her medical emergency supports an inference of discriminatory intent. (ECF No. 27-1 at 12.) But temporal proximity alone does not suffice to establish pretext. *See, e.g.*, *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 847 (2d Cir. 2013) ("Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage."); *Iverson v. Verizon Communications*, 2009 WL 3334796 at *5 (S.D.N.Y. Oct. 13, 2009) ("Merely claiming temporal proximity between the disclosure of disability and termination, however, is not enough to show that [employer's] reasons for termination were a pretext for discrimination."); *Trent v. Town of Brookhaven*, 966 F. Supp. 2d 196, 206 (E.D.N.Y. 2013) ("Temporal proximity may be sufficient to show a prima facie case, but it is insufficient to demonstrate pretext."). Mancini's reliance on *Treglia v. Town of Manlius*, 313 F.3d 713 (2d Cir. 2002), is misplaced. There, the court found that temporal proximity was sufficient to establish causation *for the purposes of establishing a prima facie case*. At the pretext stage, the *Treglia* court relied on substantial additional evidence in finding for the plaintiff, including statements and conduct by the plaintiff's

supervisor bringing the employer's non-discriminatory reasons into doubt.  *See id.* at 721-22.

Mancini also argues that a jury could infer discriminatory animus from Klansek's denial of her request for FMLA leave on April 6 as well as Klansek's comments on March 22 that Mancini was not a "team player" unless she ran her requests for FMLA leave by Klansek first.  (ECF No. 27-1 at 10; Pl.'s Aff. at ¶¶ 49, 79, 81.)  Accredo argues that Mancini's allegation to this effect does not create a triable issue of fact because Mancini previously testified at her deposition that she had not requested that day off, and the sham issue of fact doctrine precludes her from defeating summary judgment "by submitting an affidavit that contradicts [her] previous sworn testimony."  (ECF No. 30 at 3 (quoting *Moll v. Telesector Resources Group, Inc.*, 760 F.3d 198, 205 (2d Cir. 2014)).)

During her deposition, Mancini was asked whether March 22 was "the only time that you made a call in advance for FMLA [leave]," to which she replied, "Yes."  (ECF No. 30 at 16.)  She was also asked, "[A]t any point, did you ask for FMLA time for April 6th of 2016," to which she replied, "No.  I did not have time."  (*Id.* at 18.)  Mancini then elaborated that she "was in the hospital . . . [a]nd the first conversation [she] had with Lois [Klansek] was on the 8th."  (*Id.*)  She was asked, by way of clarification, whether she ever "called Aon Hewitt related to requesting an FMLA absence for April 6th, 2016," to which she replied, "No."  (*Id.*) She was also asked whether she told Klansek, "I'm going home sick; I'm not going to see my last patient," to which she responded, "No, I did not."  (*Id.* at 22.)

In Mancini's affidavit, however, which she submitted in support of her opposition to the present motion for summary judgment, Mancini states regarding her April 6 phone

call with Klansek: "I informed [Klansek] of my symptoms, and asked that I be excused from work due to my symptoms, but her response was that I would have to meet the needs of my patients, and because I was unable to reschedule anyone to April 8, 2018 due to my previous schedule [sic] leave, and the patient's schedule, then she denied my leave request." (ECF No. 27-2 at ¶ 79.) Mancini further states that "I did not use the exact words 'serious medical condition' but I did ask for leave, and I did describe the medical symptoms that I was experiencing at the time . . . ." (*Id.* at ¶ 81.)

I find that Mancini's newly proffered testimony does not so plainly contradict her deposition testimony that it constitutes "sham evidence." Mancini does not now claim that she "call[ed] in advance" to request FMLA leave for April 6, nor does she claim that she called Aon Hewitt to request leave—both of which would contradict her deposition testimony. Nor does her testimony that she did not tell Klansek she was "going home sick" contradict her affidavit. Her statement at the deposition could reasonably be interpreted as indicating that although Mancini requested leave, she did not insist on it once Klansek refused. Resolving all ambiguities in Mancini's favor, as the Court must at this stage, even Mancini's negative response when she was asked whether she "at any point" asked "for FMLA time for April 6th of 2016" (ECF No. 30 at 18) is reconcilable with the testimony in her affidavit, because the surrounding deposition testimony tends to limit the scope of this response to her time at the hospital and to whether she ever called Aon Hewitt to request leave.

Furthermore, other portions of her deposition testimony support the account Mancini gives in her affidavit. Mancini testified, for example, that on the April 6 call, Klansek said to her about a patient for whom she did not have coverage: "[W]hat am I

supposed to do with this patient?" (ECF No. 27-10 at 24.) And when asked whether Klansek told her, "[Y]ou need to see this patient because we need to get business from this patient by referrals?" she responded, "Not in those words." (*Id.*) The latter response can be reasonably interpreted to mean, "Not in those words, but she did say something similar using different words." This testimony lessens the apparent contradiction between Mancini's deposition testimony and her affidavit. In sum, I find that Mancini's deposition testimony does not so contradict her affidavit to constitute "sham evidence."

But even considering Mancini's testimony that Klansek denied her leave request, given the compelling nature of the legitimate, non-discriminatory reasons for termination offered by Accredo, I find that the evidence does not support a reasonable inference of discriminatory intent based on Mancini's disability. Reviewing the evidence in the light most favorable to Mancini, I conclude that no reasonable jury could find that Accredo's proffered reasons—the serious misconduct complained of by Mancini's patients, some of which Mancini herself admits—were pretext for disability discrimination. Klansek's alleged denial of leave on April 6 and Klansek's statement that Mancini was not a "team player" if she did not run her FMLA requests by Klansek first are only tangentially related to the real question at issue—whether Mancini can show discriminatory animus *on the basis of Mancini's disability* (as opposed to retaliatory animus for her taking and requesting FMLA leave). Mancini points to no evidence in the record that Klansek or anyone else at Accredo made remarks suggesting animus against her or others on the basis of disability; nor does she point to any evidence that she was treated differently from other similarly situated, non-disabled persons. Even with the temporal proximity between Mancini's medical emergency and her termination, the evidence does not

18

support the inference that Accredo's true motive for terminating Mancini was discrimination based on her disability. Mancini's disability discrimination claim thus fails at the third step of the *McDonnell Douglas* framework. Accordingly, I GRANT Accredo's motion for summary judgment as to Mancini's ADA claim.

## B. The CFEPA Claim

Mancini also alleges that Accredo's actions violated the Connecticut Fair Employment Practices Act. (ECF No. 1 at 11.) The CFEPA makes it unlawful for an employer to discharge an employee "because of" the employee's physical disability. Conn. Gen. Stat. § 46a-60(a)(1). Generally, "[c]laims under the CFEPA are analyzed using the same burden shifting framework set forth by the Supreme Court in *McDonnell* for use in Title VII, ADA, and ADEA cases." *Berube v. Great Atlantic & Pacific Tea Co., Inc.*, 2010 WL 3021522 at *9 (D. Conn. 2010); *see also Hopkins v. New England Health Care Employees Welfare Fund*, 985 F. Supp. 2d 240, 256 (D. Conn. 2013) ("The only relevant difference between the analysis a court undertakes in regards to ADA and CFEPA claims is in defining physical disability."); *DeAngelo v. Yellowbook Inc.*¸ 105 F. Supp. 3d 166, 180 (D. Conn. 2015) (CFEPA's broader definition of "disability" is the only difference between the analyses under the CFEPA and the ADA.).

Since whether Mancini is disabled is not at issue here, the analysis of Mancini's CFEPA claim is the same as for the ADA claim. Mancini has produced no evidence beyond mere temporal proximity to support a reasonable inference that Accredo's non-discriminatory reasons for terminating Mancini were in fact pretext for disability discrimination. It is well established that temporal proximity alone is inadequate at the pretext stage. *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010)

("[T]emporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext"); *see also Marini v. Costco Wholesale Corp.*, 64 F. Supp. 3d 317, 333 (D. Conn. 2014) (granting employer's motion for summary judgment as to the plaintiff's ADA and CFEPA claims because, even if the plaintiff had made a prima facie showing, "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage.") (citations and internal quotations marks omitted).[2]  Therefore, I GRANT Accredo's motion for summary judgment as to the CFEPA claim.

## C.  The FMLA Claim

Mancini alleges that Accredo also violated her rights under the Family and Medical Leave Act.  (ECF No. 1 at 1.)  The FMLA entitles eligible employees "to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1).  Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  The Second Circuit has recognized two causes of action under Section 2615(a)(1)—"interference" and "retaliation."  *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).  Mancini brings only a "retaliation" claim.  (*See* ECF No. 1. at 1 (mentioning only a "retaliation claim" under the FMLA); ECF No. 27-1 at 1 ("The plaintiff sued the defendant for disability discrimination, and retaliation for exercising her rights under the FMLA.").)

---

[2] It remains unsettled whether causation under the CFEPA is analyzed using the "but-for" or "motivating factor" standard.  *See Vale v. City of New Haven*¸ 197 F. Supp. 3d 389, 397-99 (D. Conn. 2016) (documenting the controversy with respect to age discrimination claims).  The Court need not weigh in on the debate here, as Mancini has not carried her burden of showing pretext under either standard.

Like ADA discrimination claims, FMLA retaliation claims are also analyzed under the familiar *McDonnell Douglas* burden-shifting rubric. *Roberts v. Health Ass'n*, 308 Fed. App'x 568, 570 (2d Cir. 2009). To make a prima facie showing of retaliation, Mancini must establish: (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Id.* Upon a successful prima facie case, the burden shifts to Accredo to proffer a legitimate, nondiscriminatory reason for the adverse employment action. If Accredo meets this burden, then Mancini must demonstrate that Accredo's purported reason was pretext for retaliation for requesting FMLA leave.

The parties do not dispute the first three elements of Mancini's prima facie case. As to the fourth element—whether Mancini's termination occurred under circumstances giving rise to an inference of retaliatory intent—Mancini points to Klansek's March 22 comment that she was not being a "team player" and Klansek's alleged denial of Mancini's April 6 request for leave,[3] as well as the temporal proximity between Mancini's exercise of her rights under the FMLA and her termination. As "the burden of making out a prima facie case is not onerous," *Ben-Levy v. Bloomberg, L.P.*, 518 Fed. App'x 17, 19 (2d Cir. 2013), I find that Mancini has established a prima facie case of FMLA retaliation.

As discussed above, Accredo has, in turn, proffered a legitimate, non-retaliatory reason for terminating Mancini—namely, Mancini's alleged unprofessional behavior and inadequate care for her patients. Thus, the survival of Mancini's claim again turns on

---

[3] As discussed previously, Mancini's testimony that Klansek denied her April 6 request for leave is not precluded by the sham evidence doctrine.

whether Mancini can point to evidence from which a reasonable jury could infer that Accredo's proffered reason was pretext for retaliation.

To show pretext, a plaintiff can rely on either evidence "showing that the employer's proffered explanation is unworthy of credence" or "evidence comprising the prima facie case, without more." *Sista*, 445 F.3d at 173; *see also Poitras v. ConnectiCare, Inc.*, 206 F. Supp. 3d 737, 749 (D. Conn. 2016) ("Evidence of pretext may include temporal proximity between the protected activity and the adverse action plus additional evidence either showing retaliatory animus or disproving the truth of the employer's legitimate reason for the adverse action."). It is not necessary that the plaintiff prove that an employer's stated justification was false. *Henry v. Wyeth Pharms. Inc.*, 616 F.3d 134, 156 (2d Cir. 2010) ("The crucial element of a claim under Title VII is discrimination, not dishonesty. . . . It seems clear that [what was intended in discussions of "pretext" in Supreme Court opinions] was not intent to deceive, but inaccuracy or incompleteness resulting from the failure to include the fact of discriminatory motivation."); *see also Moody v. Aircastle Advisor, LLC*, No. 3:13-CV-00575 (VAB), 2016 WL 1257805, at *11 (D. Conn. Mar. 30, 2016) (holding that Plaintiff may prevail at the pretext stage by simply "demonstrating that a discriminatory reason more likely than not motivated [employer's] adverse employment actions"). Ultimately, the question at the pretext stage is whether Plaintiff has "come forward with evidence establishing that it is more likely than not [that] the employer's decision was motivated, at least in part, by an intent to retaliate against him." *El Sayed*, 627 F.3d at 932-33. Further, unlike disability discrimination claims under the ADA, retaliation claims under the FMLA are governed by the "motivating factor" causation standard, and not the "but-for" standard.

*Woods v. Start Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 166 (2d Cir. 2017)

("[A] 'motivating factor' causation standard applies to [FMLA retaliation claims].").

I find that Mancini has met her burden of producing evidence from which a jury could reasonably conclude that "it is more likely than not [that] the employer's decision was motivated, at least in part, by an intent to retaliate against [her]," *El Sayed¸* 627 F.3d at 923-33. While the evidence concerning Klansek's remarks and conduct does not clearly suggest she harbored animus on the basis of disability, it does suggest animus concerning FMLA leave, because her remarks and conduct were triggered by FMLA leave requests (or at least a reasonable juror could so find). Mancini has testified that Klansek called Mancini the very first day Mancini requested FMLA leave to reprimand her for following Accredo's own protocol for requesting leave rather than checking with Klansek first, telling her she wasn't being a "team player." (Pl.'s Aff. at ¶¶ 48-49.) Mancini has also testified that Klansek resisted Mancini's efforts to take leave on the afternoon of April 6, effectively denying her request for leave. (Pl.'s Aff. at ¶¶ 46, 79, 81.) This evidence supports the inference that Klansek was displeased at Mancini's exercise of her rights under the FMLA and harbored retaliatory animus toward her for doing so. Mancini also provides evidence of temporal proximity: She claims she requested leave on March 22, April 6, and April 8, and she was terminated on April 19. A reasonable jury could infer from the combination of this evidence that, even if Accredo's non-retaliatory reasons for terminating Mancini were not false, they are nonetheless pretextual in the sense that Accredo used them to obscure its additional, retaliatory motive for terminating Mancini. Of course, this is not to say that Accredo was, in fact, motivated by retaliatory animus. It is only to say that, when the evidence in

the record is viewed in the light most favorable to Mancini, a reasonable jury could so infer.  Because there remains a genuine dispute of material fact, the Court DENIES Accredo's motion for summary judgment as to Mancini's claim for FMLA retaliation.

**V.  Conclusion**

For the foregoing reasons, Accredo's motion for summary judgment as to the ADA claim and the CFEPA claim is GRANTED.  Accredo's motion for summary judgment as to the FMLA retaliation claim is DENIED.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea
United States District Judge

Dated:          Hartford, Connecticut
                September 4, 2019